**IN THE CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE
TWENTIETH JUDICIAL DISTRICT AT NASHVILLE**

<div style="border:1px solid">

**EXHIBIT
A**

</div>

| | |
|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER, <br><br> Plaintiff, <br><br> v. <br><br> 3M COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER FIRE & SECURITY AMERICAS CORPORATION; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; EIDP, INC., F/K/A E.I. DU PONT DE NEMOURS AND COMPANY; KIDDE PLC, INC.; NATIONAL FOAM, INC.; THE CHEMOURS COMPANY; TYCO FIRE PRODUCTS LP; and ABC CORPORATIONS 1-10 (Names Fictitious), <br><br> Defendants. | JURY DEMAND <br><br> Case No. _____ |

---

## COMPLAINT

---

### I. NATURE OF ACTION

1.     The State of Tennessee, acting through the Tennessee State Attorney General and

Reporter ("Attorney General"), brings this action pursuant to the State's statutory and common

law for injuries to the State's natural resources, property, residents, and consumers against Defendants 3M Company ("3M"); AGC Chemicals Americas, Inc. ("AGC Chemicals"); Amerex Corporation ("Amerex"); Archroma U.S., Inc. ("Archroma"); Arkema Inc. ("Arkema"); BASF Corporation ("BASF"); Buckeye Fire Equipment Company ("Buckeye"); Carrier Fire & Security Americas Corporation ("Carrier Fire"); Carrier Global Corporation ("Carrier"); ChemDesign Products, Inc. ("ChemDesign"); Chemguard, Inc. ("Chemguard"); Clariant Corporation ("Clariant"); Dynax Corporation ("Dynax"); EIDP, Inc. ("Old DuPont"), f/k/a E. I. du Pont de Nemours and Company; Kidde PLC, Inc. ("Kidde PLC"); National Foam, Inc. ("National Foam"); The Chemours Company ("Chemours"); and Tyco Fire Products LP ("Tyco") (the foregoing collectively referred to as the "Manufacturer Defendants"); Corteva, Inc. ("Corteva"); DuPont de Nemours, Inc. ("New DuPont"); and ABC Corporations 1-10 (names fictitious) (collectively with Manufacturer Defendants, "Defendants").

2.      For decades, Defendants have known of the dangers of toxic per- and polyfluoroalkyl substances ("PFAS"), including the PFAS in aqueous film-forming foam ("AFFF") used for firefighting training and emergency response at military and industrial facilities, airports, and other locations throughout the State of Tennessee ("State" or "Tennessee"). Despite this knowledge, Defendants chose not to take steps to reduce those risks and instead continued to advertise, market, manufacture for sale, offer for sale, and sell AFFF that contained PFAS and PFAS-containing fluorochemicals and fluorosurfactants[1] (collectively, "AFFF Products") to, inter alia, the State's government entities, counties, municipalities, local fire departments, businesses, entities, and residents so Defendants could reap enormous profits. Now that the State and the larger

---

[1] Fluorochemicals, or fluorinated chemicals, are manmade organic compounds containing fluorine used in the manufacture of surfactants. Fluorosurfactants, or fluorinated surfactants, are synthetic organofluorine chemical compounds that have multiple fluorine atoms.

public are becoming aware of just some of the massive problems Defendants have created while enriching themselves, Defendants seek to foist the equally enormous costs to address them back on the victims of their concealment.

3.      The U.S. Environmental Protection Agency ("EPA") claims to have identified more than 12,000 PFAS compounds and has concluded that exposure to PFAS may lead to significant negative health effects, including but not limited to decreased fertility and preeclampsia/increased high blood pressure in pregnant women; adverse developmental effects in children such as low birth weight, accelerated puberty, bone variations, and behavioral changes; increased risk of certain cancers, including kidney and testicular cancers; reduced ability of the body's immune system to fight infections, including reduced vaccine response; interference with the body's natural hormones; increased ulcerative colitis; increased thyroid disease; and increased medically diagnosed high cholesterol and/or risk of obesity.

4.      Some of the most commonly used, studied, and presently regulated PFAS compounds include perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluoroheptanoic acid ("PFHpA"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), perfluorodecanoic acid ("PFDA"), perfluorobutane sulfonic acid ("PFBS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA," known colloquially as "GenX").[2]

5.      Defendants knew that their AFFF Products would release PFAS into the environment, harm people and natural resources, and require enormous costs to remediate, but

---

[2] As used in this complaint, "PFAS" includes, but are not limited to all PFOS, PFOA, PFHpA, PFHxS, PFNA, PFDA, PFBS, and HFPO-DA, including their acid, conjugate base, or salt forms as well as precursors that can degrade into these compounds, their neutral acid forms, anionic conjugate base forms, or neutral salt species.

3

they concealed information about the chemicals' negative health effects and affirmatively contradicted it in public statements and marketing campaigns to reap vast profits.

6.       Defendants' tortious, deceptive, and unlawful actions have caused and/or contributed to significant known PFAS contamination of the State's groundwater, drinking water, surface water, air, soil, sediment, biota, submerged lands, wetlands, other natural resources, and property held in trust or otherwise owned by the State. These toxic and persistent "forever chemicals" are contaminating countless water supplies and are requiring or will require massive effort and expense to investigate, treat, and remediate the contamination of the State's natural resources, property held in trust, and/or property otherwise owned by the State and to supply potable water to large numbers of people in the State.

7.       Most troubling, despite expending significant public resources to study the nature and extent of existing PFAS contamination in Tennessee, the State has only just begun to understand the extent of the problem, and its understanding of the PFAS problem continues to grow. Addressing the PFAS emergency that Defendants have caused requires substantial effort and expense to investigate, treat, and remediate the contamination. Defendants who created and profited from the creation of this problem, not the citizens of Tennessee who suffer from it, must pay to address the PFAS contamination throughout the State.

8.       Many locations in the State have been identified as being contaminated with PFAS caused by Defendants' AFFF. For example, during EPA's Third Unregulated Contaminant Monitoring Rule sampling conducted between 2013 and 2015, Hamilton County, Tennessee recorded PFAS levels in its drinking water system at 11.06 parts per trillion ("ppt"), which is nearly three times higher than the proposed federal maximum contaminant level of 4 ppt.

9.      Moreover, Arnold Air Force Base (located in Tullahoma, Tennessee) underwent a site investigation in 2018 to determine whether PFAS are present in soil, groundwater, and sediment, the results of which indicated a combined concentration of PFOS and PFOA far exceeding EPA's 2016 Health Advisory value of 70 ppt. Health Advisory values are concentrations of drinking water contaminants at or below which adverse health impacts are not anticipated to occur. Some groundwater samples contained PFOS and PFOA at levels thousands of times higher than 70 ppt for the combined concentration of the chemicals. By today's standards, as further described in ¶ 146, the maximum concentration of PFAS measured at Arnold Air Force Base would be approximately 44,000 times higher than what EPA considers health-protective. Nashville International Airport and the Knoxville-area McGhee Tyson Airport are likewise contaminated as a result of AFFF, with concerning levels of PFAS detected near fire training areas, fire stations, hangars, runways, and even parking lots.

10.     As the State's investigation continues, more PFAS contamination caused by Defendants' AFFF Products in the State is expected to be discovered.

## II.  THE PARTIES

11.     The State has a property interest in the waters of the State, and it also has an interest as sovereign and natural resource trustee in protecting the waters of the State from contamination. The contamination of these waters by PFAS constitutes injury to the persons and property of the State's citizens and to the waters of the State, which are held in trust by the State on behalf of all its citizens. The State may for the common good exercise all the authority necessary to protect its interests and those of its citizens.

12.     The State, as the public trustee, is empowered to bring suit to protect the corpus of the trust—i.e., the natural resources—for the beneficiaries of the trust—i.e., the public. "[W]aters

of Tennessee are the property of the state and are held in public trust for the use of the people of the state," and it is the State's public policy "that the people of Tennessee, as beneficiaries of this trust, have a right to unpolluted waters" and that "the government of Tennessee has an obligation to take all prudent steps to secure, protect, and preserve this right." Tenn. Code Ann. § 69-3-102(a). Protection of the natural resources of the State is a matter of grave public concern in which the State has an interest apart from that of particular individuals who may be affected. Pollution of the State's natural resources with PFAS has negatively affected a substantial segment of the State's population.

13.     The State brings this action pursuant to its police powers, which include but are not limited to its powers to prevent and abate pollution of the natural resources of the State; to prevent and abate nuisances; and to prevent and abate hazards to the environment and to the public health, safety, and welfare.

14.     The State also brings this suit in its *parens patriae* capacity for the benefit of the citizens of the State. It is State public policy that water pollution should be abated, polluted waters should be reclaimed, future pollution should be prevented, and water resources may be "used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters." Tenn. Code Ann. § 69-3-102(b).

15.     At all relevant times, Defendants together controlled all, or substantially all, of the market for AFFF Products in the State.

16.     Defendant 3M Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000. 3M has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test

6

equipment, released, spilled, otherwise discharged, and/or disposed in the State. 3M is registered to do business in Tennessee and may be served through Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312, or wherever it may be found.

17. Defendant AGC Chemicals Americas, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). AGC Chemicals and/or its affiliates have designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State.

18. Defendant Amerex Corporation is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 2900 Highway 280 S, Suite 300, Birmingham, Alabama 35223. Amerex manufactures firefighting products. Beginning in 1971, it manufactured hand portable and wheeled extinguishers for commercial and industrial application. Amerex has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. Amerex is registered to do business in Tennessee and may be served through CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546, or wherever it may be found.

19. Defendant Archroma U.S., Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5435 77 Center Drive, Suite 10, Charlotte, North Carolina 28217. Archroma, a subsidiary of Archroma Management, LLC, has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals

that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. On information and belief, Archroma is a successor to Clariant, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. Archroma is registered to do business in Tennessee and may be served through CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546, or wherever it may be found.

20. Defendant Arkema Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. Arkema and/or its predecessors have designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. Arkema is registered to do business in Tennessee and may be served through Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312, or wherever it may be found.

21. Defendant BASF Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a/ Ciba Specialty Chemicals Corporation). On information and belief, Ciba Inc. designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals and fluorosurfactants that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or

disposed in the State. BASF is registered to do business in Tennessee and may be served through CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546, or wherever it may be found.

22.     Defendant Buckeye Fire Equipment Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State.

23.     Defendant Carrier Fire & Security Americas Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire is the indirect parent of Kidde-Fenwal, Inc.,[3] which is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Carrier Fire is also the successor in interest UTC Fire & Security Americas Corporation, Inc., following the spinoff transaction described immediately below. Carrier Fire, through Kidde/Kidde Fire, has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State.

24.     Defendant Carrier Global Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur

---

[3] On May 14, 2023, Kidde-Fenwal, Inc. filed for bankruptcy in the case captioned *In re Kidde-Fenwal, Inc.*, Case No. 23-10638-LSS (D. Del. Bankr.). In light of the automatic stay of claims against Kidde-Fenwal, Inc., it is not named as a defendant herein pursuant to 11 U.S.C. § 362.

9

Boulevard, Palm Beach Gardens, Florida 33418. On or around April 3, 2020, United Technologies Corporation completed the spinoff of one of its reportable segments into Carrier, a separate publicly traded company. Pursuant to the Separation and Distribution Agreement by and among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation, Carrier assumed certain liabilities, including those related to the business operated by Kidde/Kidde Fire Fighting. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Carrier's Fire & Security products and services are sold under brand names that include Chubb and Kidde. At all relevant times, Carrier conducted business throughout the United States, including in the State. Carrier, through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in the State.

25.     Defendant ChemDesign Products, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Two Stanton Street, Marinette, Wisconsin 54143. On information and belief, ChemDesign designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals that contained PFAS used to manufacture AFFF, primarily to Chemguard, that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State.

26.     Defendant Chemguard, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. Chemguard has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was used in the State. Furthermore, Chemguard has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS

that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State and also has designed, manufactured, marketed, and sold fluorosurfactants that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State.

27.     Defendant Clariant Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202. Clariant has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. Clariant is a predecessor to Archroma and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. Clariant is registered to do business in Tennessee and may be served through Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312, or wherever it may be found.

28.     Defendant Corteva, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business is 974 Centre Road, Wilmington, Delaware 19805. In 2019, New DuPont spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities—including those relating to PFAS. Corteva is registered to do business in Tennessee and may be served through CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546, or wherever it may be found.

11

29.     Defendant DuPont de Nemours, Inc. (i.e., New DuPont), f/k/a DowDuPont Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company and transferred Old DuPont's historic liabilities and assets to other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities—including those relating to PFAS. New DuPont does business throughout the United States, including in the State.

30.     Defendant Dynax Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. Dynax has designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State.

31.     Defendant EIDP, Inc. (i.e., Old DuPont), f/k/a E. I. du Pont de Nemours and Company, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals and/or fluorosurfactants that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State.

32.     Defendant Kidde PLC, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Nine Farm Springs Road,

12

Farmington, Connecticut 06032. Kidde PLC was part of United Technologies Corporation. At all relevant times, Kidde PLC conducted business throughout the United States, including in the State. Kidde PLC, through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in the State.

33.     Defendant National Foam, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus brand of products and is the successor in interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). National Foam/Angus Fire has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. National Foam is registered to do business in Tennessee and may be served through the Tennessee Secretary of State, or wherever it may be found.

34.     Defendant The Chemours Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. Chemours has designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. Chemours is registered to do business in Tennessee and may be served through CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546, or wherever it may be found.

35. Defendant Tyco Fire Products LP is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. Tyco manufactures the Ansul brand of products and is the successor in interest to Ansul Company (together, "Tyco/Ansul"). Tyco/Ansul has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State and also has designed, manufactured, marketed, and sold fluorosurfactants that contained PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. Tyco is registered to do business in Tennessee and may be served through CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546, or wherever it may be found.

36. Defendants ABC Corporations 1 through 10, unknown at this time, are manufacturers of AFFF, manufacturers of fluorochemicals and fluorosurfactants that contained PFAS used to make AFFF, and/or distributors of AFFF Products that have resulted in injuries to the State's natural resources or otherwise share responsibility for such injuries. When these ABC Corporations are identified, they will be added by name.

### III. JURISDICTION AND VENUE

37. The natural resources that are the subject of this suit are all within the State of Tennessee. The State of Tennessee is not a citizen of any state for diversity purposes, and thus no diversity jurisdiction exists as a basis for federal jurisdiction. No federal subject matter jurisdiction is invoked herein.

38.     Pursuant to Tenn. Code Ann. § 20-2-201, this Court has jurisdiction over Defendants, and each of them, because Defendants are corporations that have done business in this State as it relates to transactions had, in whole or in part, within this State or causes of action arising in this State.

39.     This Court has jurisdiction over Defendants, and each of them, because this action arises from their transaction of business within this State. *See* Tenn. Code Ann. § 20-2-214(a)(1).

40.     This Court has jurisdiction over Defendants, and each of them, because this action arises from Defendants' tortious acts or omissions in the State. *See id.* § 20-2-214(a)(2).

41.     This Court has jurisdiction because it sits in the county where a public nuisance the State seeks to abate is located. *See id.* § 29-3-102.

42.     As described above, each Defendant named here maintains sufficient minimum contacts with the State such that this Court's exercise of jurisdiction over it is not contrary to the provisions of the Constitution or laws of the United States, and this Court therefore has jurisdiction pursuant to Tenn. Code Ann. § 20-2-214(a)(6).

43.     Venue is proper in Davidson County pursuant to Tenn. Code Ann. § 20-4-101(a), 102 because some part of the property that is subject to the action is located there and because some part of the cause of action arose there. Property contaminated by Defendants' AFFF Products is located throughout the State, including in Davidson County. The injury caused by Defendants' conduct is located throughout the State, including Davidson County. The property and injury in question includes but is not limited to water, wildlife, land, and submerged lands, including those within Davidson County. Defendants' AFFF Products were sold and used in Davidson County.

15

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. Regulation of PFAS, Including AFFF Products

44.  PFAS, including AFFF Products, are subject to federal regulation.

45.  For example, with respect to PFAS in drinking water, (1) in March 2021, EPA issued a final determination to regulate PFOS and PFOA as contaminants under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f *et seq.*; (2) in December 2021, EPA published the final Fifth Unregulated Contaminant Monitoring Rule, which will require public water systems around the country to monitor for 29 PFAS compounds between 2023 and 2025; (3) in June 2022, EPA issued interim health advisory levels for PFOA at 0.004 ppt, for PFOS at 0.02 ppt, and for HFPO-DA at 10 ppt; and (4) in March 2023, EPA released proposed maximum contaminant levels ("MCLs") for PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA in drinking water pursuant to the SDWA. Once enacted, the MCLs will require public water systems across the United States to monitor for these PFAS, notify the public of detections, and take action to remove PFAS concentrations above those levels.

46.  Additionally, with respect remediation of contaminated sites, (1) in October 2021, EPA announced important steps toward evaluating the existing data for four PFAS under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, and strengthening the ability to clean up PFAS contamination across the country through the RCRA corrective action process; (2) in May 2022, EPA added five PFAS to a list of risk-based values for site cleanups known as Regional Screening Levels and Regional Remedial Management Levels; (3) in August 2022, EPA issued a proposed rule that would designate PFOS and PFOA as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*; and (4) in April 2023, EPA issued an Advance Notice

16

of Proposed Rulemaking asking the public for input regarding potential future hazardous substance designations of additional PFAS compounds under CERCLA.

47. With respect to use of PFAS in products and processes in January 2023, EPA proposed a rule pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq.*, that would prevent anyone from starting or resuming, without a complete EPA review and risk determination, the manufacture, processing, or use of an estimated 300 PFAS that have not been made or used for many years, known as "inactive PFAS."

48. With respect to PFAS in discharges of wastewater, (1) in December 2022, EPA issued a memorandum providing guidance to states on how to use the National Pollutant Discharge Elimination System permitting program of the Federal Water Pollution Control Act (a/k/a the Clean Water Act), 33 U.S.C. §§ 1251 *et seq.*, to reduce harmful PFAS pollution; and (2) in January 2023, EPA released its final Effluent Limitations Guidelines ("ELGs") Plan 15, including a determination that revised ELGs and pretreatment standards are warranted for reducing PFAS in leachate discharges from landfills, an announcement of an expansion of the ongoing study of PFAS discharges from textile manufacturers, and a new study of waste streams to wastewater treatment plants.

49. With respect to reporting releases of PFAS to the environment, in December 2022, EPA proposed a rule that would improve reporting PFAS to the Toxics Release Inventory ("TRI") by, among other proposed changes, eliminating an exemption that allows facilities to avoid reporting information on PFAS when those chemicals are used in small, or de minimis, concentrations. Because PFAS are used at low concentrations in many products, this rule would ensure that covered industry sectors and federal facilities that make or use TRI-listed PFAS will

no longer be able to rely on the de minimis exemption to avoid disclosing their PFAS releases and other waste management quantities for these chemicals.

**B.     Statutory Nuisance**

50.     Tennessee's abatement of public nuisance statute defines nuisance, in part, to include anything "declared to be a nuisance by other statutes . . . ." Tenn. Code Ann. § 29-3-101(a)(2).

51.     The Tennessee Water Quality Control Act of 1977, Tenn. Code Ann. §§ 69-3-101 *et seq.*, makes it unlawful "to discharge any substance into the waters . . . where such substances cause" certain damages and defines such discharges as a "public nuisance." *Id.* § 69-3-114(a). Substances that cause pollution by altering "the physical, chemical, [or] biological . . . properties of the waters of [the] state" and "[r]esult or will likely result in harm, potential harm or detriment to public health, safety, or welfare[,] . . . health of animals, birds, fish, or aquatic life; [or] [r]ender or will likely render the waters substantially less useful for domestic, municipal, industrial, agricultural, recreational, or other reasonable uses" cause damage and are therefore a statutory public nuisance. *Id.* § 69-3-103(29).

52.     The Attorney General may bring a civil action to abate a public nuisance in the name of the State in the circuit court of the county wherein such nuisances may exist. *See id.* § 29-3-102.

**C.     Tennessee's Uniform Fraudulent Transfer Act**

53.     The State has adopted the Uniform Fraudulent Transfer Act ("UFTA") to prevent the fraudulent transfer of property by a debtor who intends to defraud creditors by placing assets beyond their reach. *See* Tenn. Code Ann. §§ 66-3-301 *et seq.* The UFTA has been enacted by a majority of states in substantively identical form, including the State of Delaware, the state where

the fraudulent transfers that form the basis for the State's claims occurred. *See* DEL. CODE tit. 6, §§ 1301-1311.

54.     Under the UFTA's actual fraudulent transfer provision, a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim. *See* Tenn. Code Ann. §§ 66-3-305(a)(1), 66-3-308(a)(1).

55.     UFTA's constructive fraudulent transfer provision provides that a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if "the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due"; or (iii) "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id.* §§ 66-3-305(a)(2), 66-3-306(a).

## V.  FACTUAL ALLEGATIONS

**A.     The Harmful Impacts of AFFF on the Environment, Animals, and Human Health**

56.     AFFF is a fire-suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires and is routinely used to train firefighters and test firefighting equipment.

57.     When used as intended during a firefighting event or training exercise, AFFF Products can cause hundreds, if not thousands, of gallons of foamy water laced with PFAS to enter the environment in a variety of ways, including but not limited to through soils, sediment, surface water, and groundwater.

19

58.     AFFF contains PFAS. PFAS are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms. The carbon-fluorine bond is one of the strongest bonds in chemistry and gives PFAS their unique chemical properties. The carbon-fluorine bond in PFAS generally does not occur in nature.

59.     The PFAS family, including PFOS, PFOA, PFHxS, PFNA, PFBS, and HFPO-DA, can cause extensive and long-lasting environmental contamination.

60.     PFAS are mobile and persist in the environment. Once introduced into the environment, PFAS quickly spread because they disperse in water and, thus, have reached numerous water systems within the State. PFAS also persist in the environment indefinitely because their multiple carbon-fluorine bonds, which are exceptionally strong and stable, are resistant to metabolic and environmental degradation processes. Similarly, removal of PFAS from drinking water sources requires specialized, and expensive, drinking water treatment systems. In short, once PFAS are used, they migrate through the environment, resist natural degradation, contaminate groundwater and drinking water sources, and are difficult and costly to remove.

61.     PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because several PFAS, including PFOS and PFOA, are very slowly excreted from individual organisms, ongoing low-level exposure results in a buildup of PFAS within the body. Thus, they also can biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

62.     PFAS are toxic and cause significant adverse effects to human health. The presence of these chemicals in drinking water presents a serious threat to public health. For example, PFOS exposure is associated with numerous adverse health effects in humans, including increases in

20

serum lipids (i.e., medically diagnosed high cholesterol); decreases in antibody response to vaccines; increases in risk of childhood infections; and adverse reproductive and developmental effects, along with pregnancy induced hypertension and preeclampsia. PFOA exposure is associated with, among other things, decreased birthweight, testicular and kidney cancers, ulcerative colitis, medically diagnosed high cholesterol, and thyroid disease.

**B.    Affected Natural Resources**

63.    Tennessee's natural resources include its waters, such as springs, streams, wetlands, groundwater, within its boundaries or otherwise subject to its jurisdiction. The General Assembly has determined "that the waters of Tennessee are the property of the state and are held in public trust for the use of the people of the state" and that "it is declared to be the public policy of Tennessee that the people of Tennessee, as beneficiaries of this trust, have a right to unpolluted waters." Tenn. Code Ann. § 69-3-102(a). Accordingly, the State holds its waters in trust for the State's citizens and has an obligation to protect public ownership interests in these through, among other things, maintaining the environmental quality of its waters.

64.    "Under Tennessee law title to the bed of a navigable stream, to the low-water mark, is publicly held and belongs to the State." *Ulhorn v. Keltner*, 637 S.W.2d 844, 846 (Tenn. 1982). For waterways that are non-navigable, Tennessee law recognizes the public's right to "free and uninterrupted use and enjoyment of such stream for all the purposes of transportation and navigation to which it is naturally adapted." *The Pointe, LLC v. Lake Mgmt. Ass'n, Inc*., 50 S.W.3d 471, 476 (Tenn. Ct. App. 2000) (quoting *Stuart v. Clark's Lessee*, 32 Tenn. 9, 16-17 (1852)); *see also* Tenn. Attorney General, Op. No. 11-75 (Oct. 2011).

65.    Tennessee has strong land preservation and conservation laws, codified in the Tennessee Natural Areas Preservation Act of 1971, under which 84 natural areas currently receive

protection. These natural areas—which amount to over 100,000 acres—will be protected in perpetuity. *See* Tenn. Code Ann. §§ 11-14-101, *et seq.* Tennessee has over 1.5 million acres of Wildlife Management Areas (WMA) that are areas protected for wildlife recreation and habitat.

66.      PFAS in AFFF products have injured these natural resources, and such injury is continuing.

67.      PFAS attributable to AFFF Products have been found in groundwater, surface water, sediments, and soils in the State where AFFF Products were used, stored, disposed of, or otherwise discharged. Furthermore, it is likely that additional contamination to natural resources from PFAS attributable to AFFF Products will be uncovered as investigations continue.

68.      Contamination from PFAS attributable to AFFF Products persists in the State's natural resources (i.e., it does not break down in the environment); damages their intrinsic (i.e., existence and passive use) value; and impairs the public benefits derived from access to, use, and enjoyment of the State's natural resources.

69.      The current and future residents of the State have a substantial interest in having natural resources uncontaminated by PFAS, as do the tourism, recreation, fishing, and other industries that rely on maintaining a clean environment for their tourists, recreational visitors, fisherman, and other patrons to visit and enjoy.

### i.      Groundwater

70.      Groundwater is a critical natural resource for the people of the State, as the State relies on groundwater for drinking, irrigation, power generation, industry, and agriculture, among other uses.

71.      Regional aquifers, such as the Mississippi River Valley Alluvial Aquifer and Memphis Sand Aquifer, make up Tennessee's groundwater resources. Many residents rely upon

the State's groundwater for their drinking water. In fact, the metropolitan area of Memphis, Tennessee relies on groundwater for all of its public water supply and is one of the largest cities in the world to rely so heavily on groundwater.

72.     The State's groundwater is used for drinking water and agriculture. Tennessee's agricultural industry, which covers nearly half the land area in the State and produces corn, hay, and cotton, among other crops, and livestock brings in over $4 billion annually to the State. Tennessee's agricultural industry employs over 40,000 Tennesseans.

73.     Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems. In addition to serving as a source of water for public water systems, agriculture, and other uses, groundwater is an integral part of the overall ecosystem in the State. Groundwater also keeps water in rivers during times of drought. During the summer months, and when there is little rain, fish and other aquatic species rely on groundwater to support stream flow, modulate temperatures, and regulate nutrients.

74.     Groundwater promotes cycling and nutrient movement within and among the State's bodies of water and wetlands, provides groundwater stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

75.     Groundwater and the State's other natural resources are unique resources that help sustain the State's economy.

76.     AFFF Products are a significant source of PFAS contamination in groundwater; PFAS mobilize in and through groundwater sources to reach areas beyond the location of the AFFF Products' use. This contamination has had and will continue to have severe and adverse effects on the State's groundwater.

77.     Investigations in the State have revealed elevated levels of PFAS in the groundwater.

78.     Investigation of contamination from AFFF Products in the State's groundwater is ongoing.

**ii.     Surface Water**

79.     Surface water is a critical ecological resource of the State. Surface water in Tennessee includes more than 50,000 miles of rivers and streams and 500,000 acres of lakes and marshes, as well as wetlands. The State's surface water has been contaminated by PFAS as a result of AFFF products. Indeed, PFAS has been detected in multiple fish species of several of the State's water bodies, including in the Tennessee, Cumberland, Wolf, and Mississippi Rivers.

80.     In addition to drinking water, surface water in the State is also used for recreational; industrial; agricultural; and other commercial purposes, including swimming, boating, and recreational fishing. The tourism, recreation and fishing industries, which are dependent on clean water, are vital to the State's economy. Surface water also provides aesthetic and ecological value, including supporting aquatic ecosystems, nearby communities, and the residents of the State.

81.     PFAS are mobile in water and can spread great distances from the point of discharge. PFAS contamination attributable to the use of AFFF Products in the State has reached and contaminated surface water throughout the State.

82.     Investigation of contamination from AFFF Products in the State's surface water is ongoing.

**iv.     Sediments, Soils, and Submerged Land**

83.     The State's sediments, soils, and submerged lands are critical components of the State's complex ecological resources. Sediments, soils, and submerged lands sustain a wide

diversity of plants and animals that are essential to a healthy ecosystem. They provide a living substrate for submerged and emergent flora, which in turn support diverse invertebrate species, wading birds, and fish and shellfish populations.

84. Sediments and soils serve as a long-term reservoir of PFAS, where PFAS are stored and released over time, impacting biota and increasing PFAS concentrations in fish tissue, other wildlife, and plants.

85. PFAS contamination caused by the use of AFFF Products in the State has reached and adversely affected soil and sediment throughout the State. Additionally, PFAS in the soil column serve as a continuing source of contamination of groundwater and other resources of the State. PFAS in sediments, as well as in surface water, increase PFAS concentrations in fish.

86. Investigation of contamination from AFFF Products in the State's sediments, soils, and submerged lands is ongoing.

**v. Biota**

87. Biota, including the State's flora and fauna, are critical ecological resources. The State is home to nearly 3,000 plant species and subspecies, including purple milkweed, velvety cerastium, and red turtlehead. The State's wildlife numbers over 1,400 species, including black bears, elk, eastern cottontail rabbit, and eastern mud turtle.

88. There are at least 200 species of animals and plants in the State at risk of extinction. Contamination attributable to PFAS from AFFF Products only compounds this risk because PFAS can cause damage to the liver and immune system in animals and has been shown to damage cell structure and organelle functions in plants.

89.     Natural resource injuries to biota in the State negatively impact not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life into the future.

90.     PFAS contamination attributable to Defendants' AFFF Products has reached and adversely affected biota in the State, such as fish and other aquatic species that live in and depend on freshwater bodies contaminated with PFAS from AFFF Products.

91.     Investigation of AFFF Products-related contamination in biota in the State is ongoing.

**C.    Manufacturer Defendants' History of Manufacturing and Selling AFFF Products**

92.     3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop AFFF.

93.     3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s. Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

94.     Arkema's predecessors supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Ciba Corporation ("Ciba") supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s. Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it supplied fluorosurfactants used to manufacture AFFF. Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it supplied fluorosurfactants used to manufacture AFFF. Following Chemours's spinoff from Old DuPont, Chemours supplied fluorosurfactants used to manufacture AFFF.

95.    At varying times, AGC Chemicals, Clariant, and Old DuPont supplied fluorochemicals used to make AFFF.

96.    From the 1960s through 2001, the U.S. Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

97.    In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. In communications with EPA at that time, 3M stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention." In its press release announcing the phase out, 3M stated "our products are safe" and that 3M's decision was "based on [its] principles of responsible environmental management." 3M further stated that "the presence of these materials at . . . very low levels does not pose a human health or environmental risk." 3M made no mention in its press releases or regulatory statements of the risks to human health and the environment posed by the chemicals, although those risks were known to it at the time.

98.    After 3M exited the AFFF market, the remaining Manufacturer Defendants continued to manufacture and sell AFFF Products that contained PFAS. Indeed, Old DuPont saw an opportunity to grab a share of the AFFF market when 3M exited, although Old DuPont had decades of evidence that PFAS were highly toxic and dangerous to the environment and human health.

99.    Manufacturer Defendants advertised, offered for sale, and sold AFFF Products to federal, state, and territory government entities, including the military, counties, municipalities, airports, fire departments, and/or other governmental or quasi-governmental entities, for use in the State.

27

100.    3M manufactured its AFFF Products through an electrochemical fluorination process that makes it possible to "fingerprint" the PFAS that originated in 3M products. The remaining Manufacturer Defendants' AFFF Products were created using a telomerization process and contain or break down into PFOA. AFFF Products manufactured by Manufacturer Defendants other than 3M are fungible and lack traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Manufacturer Defendant. Due to this fungibility, Manufacturer Defendants are in the best position to identify the original manufacturer of the AFFF Products released at any particular site. Any inability of the State to identify the original manufacturer of the specific AFFF Products released into the State's natural resources in particular instances at particular sites is a result of the fungibility of the products and not as a result of any action or inaction by the State.

101.    Manufacturer Defendants knew their customers stored large stockpiles of AFFF Products. In fact, Manufacturer Defendants marketed their AFFF Products by promoting their long shelf life. Even after Manufacturer Defendants fully understood the toxicity of PFAS—and their injurious impacts when released into the environment through use of AFFF Products exactly as they had marketed and intended for them to be used—Manufacturer Defendants concealed the true harmful nature of PFAS. Even while Manufacturer Defendants phased out production or transitioned to other formulas, they did not advise their customers that they should not use AFFF Products that contained PFAS or otherwise reveal the dangers posed by the AFFF Products.

102.    Manufacturer Defendants further did not attempt to remove their harmful products from the market. Manufacturer Defendants did not warn the State or consumers that the use of AFFF Products with PFAS would harm the environment, endanger human health, or result in

28

substantial costs to investigate and clean up groundwater contamination and damage to other natural resources.

103.    Accordingly, for many years after their original sale, AFFF Products were still being applied directly to the ground and washed into sediments, soils, and waters of the State, harming the environment and endangering human health. Manufacturer Defendants never advised their customers that they needed to properly dispose of their stockpiles of AFFF Products, and they did not advise them on how to properly dispose of AFFF Products.

**D.    Manufacturer Defendants Knew, or Should Have Known, That Their AFFF Products That Contained PFOS, PFOA, and/or Their Precursors Were Harmful to the Environment and Human Health**

**i.    3M Knew, or Should Have Known, of the Harm Caused by PFAS, and 3M Suppressed Negative Information About These Chemicals**

104.    3M has known for decades that the PFAS contained in its AFFF are toxic and adversely affect the environment and human health.

105.    By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

106.    3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

107.    As early as 1963, 3M knew that its PFAS were highly stable in the environment and did not degrade after disposal.

108.    By the 1970s, 3M had become concerned about the risks posed to the general population by exposure to 3M's fluorochemicals.

29

109. By no later than 1970, 3M knew that its PFAS products were hazardous to marine life. Still, 3M refused to take any steps to mitigate these hazards. In fact, around this time, 3M abandoned a study of its fluorochemicals after the company's release of the chemicals during the study caused severe pollution of nearby surface waters.

110. In 1975, 3M found there was a "universal presence" of PFAS (PFOA and/or PFOS) in blood serum samples taken from across the United States. Since PFAS are not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFAS, a scenario 3M discussed internally but did not share outside the company. This finding also alerted 3M to the likelihood that PFAS are mobile, persistent, bioaccumulative, and biomagnifying because these characteristics would explain the presence of PFAS in human blood.

111. As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about the health effects of PFAS.

112. In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. All monkeys died within the first few days or weeks after being given food contaminated with PFOS. The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

113. In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River adjacent to the 3M plant.

114. According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own

ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, 3M continued its resistance.

115.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

116.    In 1984, 3M's internal analyses proved that fluorochemicals were likely bioaccumulating in 3M's employees.

117.    Despite its understanding of the hazards associated with the PFAS in its products, 3M suppressed scientific research on the hazards associated with them and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

118.    At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations," those articles "can be a large obstacle to refute."

119.    Thus, 3M deceived others and hid the negative effects of PFAS. For example, Dr. Rich Purdy, a former environmental specialist with 3M, wrote a letter detailing, without limitation: (1) 3M's tactics to prevent research into the adverse effects of its PFOS, (2) 3M's submission of misinformation about its PFOS to EPA, (3) 3M's failure to disclose substantial risks associated with its PFOS to EPA, (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population, (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain, and (6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

31

120.     By the late 1990s, 3M's own toxicologist had calculated a "safe" level for PFOS in human blood to be 1.05 parts per billion at a time when 3M was well aware that the average level of PFOS being found in the blood of the general population of the United States was approximately 30 times higher than this "safe" blood level, but 3M did not disclose that information to regulatory authorities or the public.

121.     3M knew, or should have known, that its AFFF, in its intended use, would release PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State due to their toxicity. Such knowledge was accessible to 3M, but not to the State until 3M's acts and omissions came to light, and the State developed its own understanding of the toxicity of PFAS.

122.     Despite its knowledge of the risks associated with exposures to its AFFF Products, when 3M announced it would phase out its PFOS, PFOA, and related products (including AFFF) in 2000, it falsely asserted "our products are safe," instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

### ii.     Old DuPont Knew, or Should Have Known, of the Harms Caused by PFOA, and It Concealed Its Knowledge from Regulators and Users of AFFF Products

123.     In the 1950s, Old DuPont began using PFOA and other PFAS in its specialty chemical production applications, including household products, like Teflon (which was used chiefly to coat nonstick cooking utensils), and quickly thereafter, developed an understanding of the dangers of using these chemicals.

124.     During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that Teflon, which was manufactured using PFOA and other PFAS, and related industrial facilities

32

emitted and discharged PFOA and other PFAS in large quantities into the environment and that many people had been exposed to its PFAS, including via public and private drinking water supplies.

125. Old DuPont scientists issued internal warnings about the toxicity associated with PFOA as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

126. In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

127. By 1979, Old DuPont had data indicating that, not only was organic fluorine/PFOA building up in the blood of its exposed workers (and was, thus, "biopersistent"), but those workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the State, at that time.

128. The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

129. Not only did Old DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees.

33

Of the eight women in the study who worked with Teflon, two—or 25%—had children with birth defects in their eyes or face and at least one had PFOA in the umbilical cord.

130. Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of the study of its own workers.

131. Not only did Old DuPont know about PFOA's toxicity as early as the 1960s, it was also aware that PFAS was capable of contaminating the surrounding environment, leading to human exposure. For example, no later than 1984, Old DuPont was aware that PFOA released from its manufacturing operations was contaminating local drinking water supplies, but said nothing to regulators or the affected communities.

132. Old DuPont was long aware that the PFAS it was releasing from its facilities could leach into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont, held a meeting at its corporate headquarters in Wilmington, Delaware in 1984 to discuss health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position." Nevertheless, Old DuPont not only decided to keep using and releasing PFOA, but affirmatively misrepresented to regulators, the scientific community, and the public that its PFOA releases presented no risks to human health or the environment.

133. Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

134. In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA in violation of the TSCA and RCRA. Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

135. Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, began to sell AFFF after 3M announced its phase out of PFOS and PFOA in 2000 (due to 3M's knowledge of the compounds' toxicity and threats of further enforcement action by EPA). In 2008, Old DuPont literature was quoted in an Industrial Fire World magazine article regarding AFFF, stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA." Old DuPont knew these statements were not true but did not correct them.

### iii.    The Remaining Manufacturer Defendants Knew, or Should Have Known, of the Harm Caused by the Release of PFOA from Their AFFF Products

136.    The remaining (non-3M/Old DuPont) Manufacturer Defendants knew, or should have known, that in their intended common use, their AFFF Products that contained PFAS would harm the environment and human health.

137.    The remaining Manufacturer Defendants knew, or should have known, that due to their toxicity, their AFFF Products released PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State.

138.    Information regarding PFAS was readily accessible to each of the remaining Manufacturer Defendants for decades. Each is an expert in the field of AFFF Products' manufacture and of the materials that contained PFAS that are needed to manufacture AFFF Products, and each has detailed information and understanding about the PFAS in AFFF Products. The State, by contrast, did not have access to such information.

### iv.    Old DuPont Worked in Concert with Other Manufacturer Defendants and the Firefighting Foam Coalition to Protect AFFF Products from Scrutiny

139.    The Firefighting Foam Coalition ("FFFC"), a Virginia-based national AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability. National Foam, Kidde-Fenwal, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours (collectively, "FFFC Members") were members of the FFFC, as were others in the industry. Through their involvement in the FFFC and other trade associations and groups, FFFC Members shared knowledge and information regarding PFOA and its precursors released from AFFF Products but did not share that information with the general public or government entities, including the State.

36

140.    FFFC Members worked together to protect AFFF Products from scrutiny by, among other things, coordinating their messaging on PFOA's toxicological profile and on their AFFF Products' contribution of PFOA into the environment. All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and government entities' learning the truth about the harms of PFOA to the environment and human health. FFFC Members regularly published newsletters promoting their AFFF Products, while also regularly attending trade group conferences to disseminate misleading messaging.

141.    FFFC Members' coordinated messaging and publishing efforts were meant to dispel concerns about the impact AFFF Products had on the environment and human health. They worked in concert to conceal from the general public and government entities, including the State, the known risks of their AFFF Products.

142.    FFFC Members repeated the same messaging for years, with the result that only one PFAS chemical—PFOS, which FFFC Members' products did not contain—was taken off the market.

143.    FFFC Members knew, however, that their messaging regarding their AFFF Products was false. Each of the FFFC Members knew that PFOA was released directly into the environment from the use of their AFFF Products and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While FFFC Members knew this, it was not similarly understood by the public and government entities, including the State because FFFC Members would not share their knowledge about the dangers of PFAS and AFFF Products.

E.     **AFFF Products Have Resulted in PFAS Contamination in the State, Including Sources of Drinking Water, and Manufacturer Defendants Are Liable for Costs to Remediate and Restore Contaminated Natural Resources**

144.     The State's natural resources have been contaminated with PFAS by the use of AFFF Products, and investigation of that contamination is ongoing. Manufacturer Defendants' designing, manufacturing, marketing, and selling of AFFF Products in the State, including to the U.S. military, have been substantial factors in causing PFAS contamination and its injuries to the natural resources of the State. As investigation continues, additional locations are identified, and on- and offsite AFFF Products-related contamination is delineated, it is expected that significant further PFAS contamination from AFFF Products will be discovered.

145.     Although the contamination from Manufacturer Defendants' AFFF Products is widespread in the State, the following sites exemplify the variety and breadth of the contamination these products have caused in the State: Arnold Air Force Base, Nashville International Airport, and McGhee Tyson Airport.

146.     Arnold Air Force Base, located on Wattenhdorf Memorial Highway, in Tullahoma City and Franklin and Coffee Counties, is contaminated with PFAS derived from the U.S. Air Force's use of AFFF in fire training areas, hangar fire suppression systems, and emergency response actions. Samples collected for a 2018 Site Inspection revealed the presence of PFAS in excess of EPA's then-applicable 2016 lifetime Health Advisory values at eight out of nine previously identified AFFF release areas. At release areas that penetrate the Manchester and Fort Payne aquifers, the combined concentration of PFOS and PFOA measured 19 times higher than the Health Advisory value for groundwater. At one release area, the combined concentration of PFOS and PFOA was detected in groundwater at 2,500 times the Health Advisory value.

38

147.     Nashville International Airport, located at 1 Terminal Drive, Nashville, Davidson County, Tennessee is contaminated with PFAS resulting from the storage and/or release of AFFF at the fire station, fire equipment test area, flight apron, and surface water drainage outfalls. All four sites sampled for a 2018 Site Inspection measured combined concentrations of PFOS and PFOA in excess of Health Advisory values. At one storm water outfall, concentrations measured four times the 2016 Health Advisory value for surface water. The outfall drains the western side of the Base, including the apron, and is located beneath a pedestrian bridge.

148.     McGhee Tyson Airport, located at 2055 Alcoa Highway, Alcoa, Blount County, Tennessee, is a contaminated site at which airport personnel began using AFFF in fire training areas, fire stations, hangars, runways, and parking lots in the early 1970s. Results from a 2019 Site Inspection indicated the presence of PFAS in every sample and revealed several exceedances of the 2016 Health Advisory values for groundwater and surface water, and the concurrent EPA screening levels for soil and sediment. Results also showed off-base migration of a combined concentration of PFOS and PFOA in surface water and groundwater. The maximum detected groundwater combined PFOS and PFOA concentration exceeded the health advisory level by 70 times.

149.     As investigation of AFFF Products-related contamination continues, additional contaminated areas will be discovered on a location-by-location basis. Such investigation is necessary to ascertain the scope of AFFF Products-related contamination and to return the affected natural resources to levels that are safe for human health and the environment and to the condition they were in prior to the impact of these contaminants.

150.     Manufacturer Defendants are liable for the cost of investigation, remediation, and restoration of all the property, soils, sediments, waters, and other natural resources contaminated

39

with PFAS from AFFF Products, as well as for the State's loss of past, present, and future use of such contaminated natural resources.

151. The PFAS contamination in groundwater and surface water is likewise impacting the State's drinking water sources. Manufacturer Defendants are liable for all of the costs necessary to investigate and treat (in perpetuity) any and all drinking water wells and sources of drinking water adversely affected by PFAS from AFFF Products in the State.

## F. Old DuPont's Multi-Step, Years'-Long Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors

152. Beginning in or about 2013 and continuing through at least June 2019, Old DuPont planned and executed a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy environmental liabilities—especially those arising from PFOA and other PFAS contamination.

153. Old DuPont's potential cumulative liability related to PFOA and other PFAS, including AFFF that contained PFAS, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well Old DuPont's decades'-long attempt to hide the dangers of PFAS from the public.

154. For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that many people had been exposed to PFOA, including through public and private drinking water supplies, like those in the State, which Old DuPont had contaminated. Thus, Old DuPont

40

knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS, including AFFF that contained PFAS.

155. Beginning in at least 1999 and continuing to the present, Old DuPont has faced mounting litigation arising from its historic manufacture, production, and use of PFAS. In 1999, members of the Tennant family, who owned property affected by contamination from a landfill that had accepted PFOA wastes from Old DuPont's nearby Washington Works plant, sued Old DuPont in West Virginia federal court.

156. Old DuPont's in-house counsel were very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

157. In 2005, after settling the Tennant case, Old DuPont settled the claims brought by EPA for violations of TSCA and RCRA related to its failure to disclose toxicity and exposure information for PFOA, as discussed in ¶ 134.

158. Also in 2005, a West Virginia court entered a final order approving a 2004 settlement of a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

159.     Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could have caused each of the linked diseases.

160.     By 2012, after seven years of studies, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

161.     After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio. Forty bellwether trials were scheduled to take place in 2015 and 2016.

162.     Old DuPont knew or should have known that it faced substantial exposure at these trials, as well as the liability related to PFOA and other PFAS contamination caused by its manufacturing operations at other sites throughout the country, and that its liability likely measured in the billions of dollars.

163. Anticipating this significant liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

164. In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals" in or about 2013.

165. However, neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing it to the substantial PFAS and environmental liabilities that Old DuPont faced.

166. Accordingly, Old DuPont's management decided to pursue a multiyear corporate restructuring specifically orchestrated to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

167. Old DuPont engaged in a coordinated three-part restructuring plan that consisted of (i) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company; (ii) the creation of New DuPont to facilitate a purported merger with Old Dow; and (iii) a series of internal restructurings and divestitures that culminated with the spinoff of Old DuPont to its newly formed parent, Corteva.

168. The first step in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business") into its wholly owned subsidiary, Chemours. Then, in July 2015, Old DuPont "spun

off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

169.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not insulate its own assets from its PFAS liabilities as Old DuPont still faced direct liability for its own conduct.

170.    The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

171.    In the third step, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

172.    Those realignments and divestitures culminated in DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

173.    Old DuPont's restructuring—beginning with the spinoff of Chemours in 2015 and ending with the spinoff of Corteva in 2019—was designed to separate Old DuPont's massive historic PFAS liabilities from its valuable, non-PFAS assets and thereby hinder, delay, and defraud creditors.

174. As a result of this restructuring, between December 2014 (i.e., before the Chemours Spinoff) and December 2019 (i.e., after the Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

175. New DuPont and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

176. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, buried these details in an apparent attempt to hide from creditors, like the State, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

177. The below graphic depicts the restructuring as it progressed through each of the three steps:



178. In greater detail, the restructuring scheme was implemented as follows.

i.      **Step 1: The Chemours Spinoff**

179.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

180.    On April 30, 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company."

181.    On July 1, 2015, Old DuPont completed the spinoff of Chemours, and Chemours became a separate, publicly traded entity.

182.    At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

183.    Prior to the Chemours Spinoff, Chemours's Board of Directors was dominated by Old DuPont employees. As a result, during the period of time that the terms of its separation from Old DuPont were being negotiated, Chemours did not have an independent Board of Directors or management independent of Old DuPont.

184.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into a June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

185.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

186.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

187.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

188.    Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. On May 12, 2015, Old DuPont required Chemours to fund these distributions through financing transactions, including senior secured term loans and senior unsecured notes totaling approximately $3.995 billion. Also, Chemours distributed approximately $3 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

189.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of the State, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, transferred only $4.1 billion in net assets to Chemours.

190.    In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

191.    Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to

47

and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

192.    Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against and assume for itself the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Chemours Spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

193.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

194.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

195.    In May 2019, Chemours sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. *See The Chemours Company v. DowDuPont, et al.*, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019).

196.    In its Amended Complaint—which was verified by Chemours's current Chief Executive Officer, Mark Newman—Chemours alleged that the primary motivation for the

Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

197. Chemours also alleged, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

198. There was no meaningful, arms'-length negotiation of the Chemours Separation Agreement, and Old DuPont largely dictated its terms.

199. In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all of the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of the commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

200. Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products such as AFFF that contained PFAS and, in so doing, shield Old DuPont.

201. Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its

"significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

202.     Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

203.     At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

204.     For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

205.     Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont's and Chemours's facilities.

206.     For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the Ohio MDL brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

207.     Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative

equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

### ii. Step 2: The Old Dow/Old DuPont "Merger"

208. After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

209. Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

210. Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

211. On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "DowDuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

212. To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "DowDuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont and then renamed

DuPont de Nemours, Inc. (i.e., New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

213.    Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

214.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

215.    The corporate organization following the "merger" is depicted under "Step 2" in the graphic in ¶ 177.

### iii.    Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow

216.    Following the DowDuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

217.    It is apparent that the transactions were intended to further frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

218.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three

distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

219.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont for far less than the assets were worth.

220.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow and holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

221.    The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned disposition of the new companies):



222.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

223.    The DowDuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

224.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained—(i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

225.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including the PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

226.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State's claims in this case.

227.    While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the State's natural resources.

228. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

229. DowDuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

230. On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

231. Corteva now holds 100% of the outstanding common stock of Old DuPont.

232. The corporate structures of New DuPont, New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted in Step 3 of the graphic in ¶ 177.

233. Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

234. On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**G.    The Effect of the Years'-Long Conspiracy to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

235. The net result of these transactions, including the June 1, 2019 Corteva spinoff, was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

236. Old DuPont estimated that the DowDuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

237.     In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

238.     For example, for the 2014 fiscal year, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

239.     Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

240.     Also, for the 2014 fiscal year, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the 2019 fiscal year, Old DuPont owned just under $21 billion in tangible assets.

241.     That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

242.     As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were composed of intangible assets, including "goodwill" from its successive restructuring activities.

56

243.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

244.    In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

245.    Indeed, New DuPont—to which PFAS liabilities are allocated under the DowDuPont Separation Agreement—has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value and is in the process of divesting more.

246.    Old DuPont's parent holding company, Corteva—to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

247.    The Chemours Spinoff, the DowDuPont Merger and the final separation of Corteva were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors. The Chemours Spinoff constitutes a fraudulent transfer, which entitles the State to, among other things, void the transaction and recover property or value transferred from Chemours in the transaction. The DowDuPont Merger and separation of Corteva from New DuPont likewise constitute a fraudulent transfer that entitles the State to, among other things, recover property and value transferred to New DuPont and Corteva.

## VI.   CLAIMS

### COUNT I
### STATUTORY NUISANCE – TENN. CODE ANN. §§ 29-3-101, 69-3-101

**(ALL DEFENDANTS)**

248.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

249.     Manufacturer Defendants created a public nuisance as defined pursuant to Tenn. Code Ann. § 29-3-101(a)(2) and § 69-3-114(a) by manufacturing, marketing, and distributing AFFF Products in a manner that resulted in discharges of AFFF Products into waters of the State where the AFFF Products have polluted the waters by altering the physical, chemical, biological properties of the waters, resulting in harm to the public health, safety, and welfare, as well as detriment to the health of animals, birds, fish, and aquatic life, and has rendered the waters less useful for domestic, municipal, industrial, agricultural, recreational, and other reasonable uses.

250.     By polluting waters of the State, as described above, Manufacturer Defendants have caused a public nuisance.

251.     Manufacturer Defendants are liable and subject to a temporary writ of injunction "enjoining and restraining the further continuance of such nuisance," *id.* § 29-3-105, and/or an abatement order that "shall perpetually enjoin the defendant from engaging in, conducting, continuing, or maintaining the nuisance, directly or indirectly, by the defendant or defendant's agents or representatives[.]" *id.* § 29-3-110.

252.     As described above, Corteva and New DuPont assumed Old DuPont's statutory nuisance liability.

**COUNT II**
**NEGLIGENCE AND GROSS NEGLIGENCE**
**(ALL DEFENDANTS)**

253.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

58

254. Manufacturer Defendants had a duty to the State to ensure that PFAS were not released as a result of the use of their AFFF Products and did not injure drinking water, groundwater, surface water, sediment, soils, biota, and other natural resources in the State.

255. Manufacturer Defendants had a duty to the State to exercise due care in the research, design, formulation, handling, manufacture, marketing, sale, testing, labeling, use, distribution, promotion, and/or instructions for use of their AFFF Products that contained PFAS.

256. Manufacturer Defendants breached these duties in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, manufactured, marketed, sold, tested, labeled, used, distributed, promoted, and/or instructed for use of AFFF Products when they knew, or should have known, that PFAS would be released into the environment and contaminate the State's natural resources.

257. Despite their knowledge that contamination with PFAS was the inevitable consequence of their conduct as alleged herein, Manufacturer Defendants failed to fully research the effects of PFAS on human health and the environment and failed to provide reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of PFAS in their AFFF Product information and/or instructions for use.

258. Through their negligent conduct in connection with the manufacture and sale of AFFF Products, and their failure to disclose the dangers to human health and the environment associated with PFAS, Manufacturer Defendants breached their duty to the State by unlawfully causing, permitting, or suffering to be thrown, run, drained, allowed to seep, or otherwise discharged into any of the waters of this State, materials from Manufacturer Defendants' AFFF

59

Products that contained PFAS that cause or tend to cause pollution of the State's waters, in violation of the Tennessee Water Quality Control Act, Tenn. Code Ann. §§ 69-3-101 *et seq*.

259. As a direct and proximate result of Manufacturer Defendants' acts and omissions, the State has suffered monetary losses and damages in amounts to be proven at trial, including but not limited to investigation, remediation, treatment, monitoring, and restoration, rehabilitation, acquisition of the equivalent of, and replacement costs and expenses for which Manufacturer Defendants are jointly and severally liable.

260. As long as the State's natural resources remain contaminated with PFAS from AFFF Products due to Manufacturer Defendants' conduct, the harm to the State continues.

261. Manufacturer Defendants acted with willful or conscious disregard for the rights, health, and safety of the State's residents and the wellbeing of the State's natural resources, thereby entitling the State to an award of punitive damages.

262. As described above, Corteva and New DuPont assumed Old DuPont's negligence liability

## COUNT III
## TRESPASS – COMMON LAW
## (ALL DEFENDANTS)

263. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

264. Trespass is an unprivileged, intentional intrusion on land in the possession of another, which may arise from the release of chemicals causing contamination of the property.

265. At all pertinent times, the State held exclusive possession in trust or otherwise owned land in the State contaminated by Manufacturer Defendants' AFFF Products, which caused and continue to cause PFAS contamination of the State's air, soil, sediment, biota, surface water,

submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the State.

266. At all times relevant to the present cause of action, Manufacturer Defendants, as designers, manufacturers, marketers, and sellers of AFFF Products that contained PFAS, provided the AFFF Products that were used throughout the State, including on land owned by the State, that resulted in the contamination of air, soil, sediment, biota, surface water, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the State.

267. Manufacturer Defendants affirmatively, unreasonably, voluntarily, and intentionally provided AFFF Products to entities in the State. It was reasonably foreseeable to the Manufacturer Defendants that the introduction of AFFF Products that contained PFAS to the State could disturb the State's possessory interest over its natural resources, as large quantities of PFAS would and/or could be introduced into the State's air, soil, sediment, biota, surface water, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the State.

268. Manufacturer Defendants' acts or omissions caused PFAS from AFFF Products to be released into the State's natural resources, thereby contaminating and injuring these resources. These acts or omissions wrongfully caused waste or injury to the State's lands. Moreover, at the time the Manufacturer Defendants' acts or omissions caused the contamination, waste, and injury to the State's lands, the Manufacturer Defendants knew, or should have known, that they lacked any authorization to cause, or permit to be caused, PFAS contamination, waste, and injury to the State's lands.

269.     Manufacturer Defendants thus have trespassed and are liable for all damages from that trespass, and the State is entitled to recover all such damages and other relief.

270.     As described above, Corteva and New DuPont assumed Old DuPont's trespass liability.

<div align="center">

**COUNT IV**
**UNJUST ENRICHMENT**
**(ALL DEFENDANTS)**

</div>

271.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

272.     Manufacturer Defendants marketed, sold, and distributed their AFFF Products to the State and other users in the State for profit.

273.     Manufacturer Defendants knew of the dangers that their AFFF Products posed to the State's air, soil, sediment, biota, surface water, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the State, as well as the public's health and safety.

274.     Manufacturer Defendants knew or should have known about reasonably safer and feasible alternatives to their AFFF Products, but chose to maximize profit instead of adopting those alternatives.

275.     The State has conferred a benefit upon Manufacturer Defendants by incurring costs of the contamination from Manufacturer Defendants' AFFF Products, while Manufacturer Defendants have not borne those costs, thereby increasing their profits.

276.     It is unjust for Manufacturer Defendants to retain the benefits gained from forcing the state to incur costs associated with the contamination from their AFFF Products, instead of bearing that cost themselves.

277.     As described above, Corteva and New DuPont assumed Old DuPont's unjust enrichment liability.

## COUNT V
## ACTUAL FRAUDULENT TRANSFER (CHEMOURS SPINOFF) – UFTA
## (OLD DUPONT, CHEMOURS, CORTEVA, AND NEW DUPONT)

278.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

279.     Under UFTA's actual fraudulent transfers provision, a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim. *See* Tenn. Code Ann. § 66-3-305(a)(1).

280.     Under UFTA, a "creditor" is "a person who has a claim." *Id.* § 66-3-302(4). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 66-3-302(3).

281.     The State is and was a creditor of Chemours at all relevant times.

282.     Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

283.     The Chemours Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

284.     At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

63

285.     Chemours made the Chemours Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours.

286.     The State has been harmed as a result of the Chemours Transfers.

287.     Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the State that have been damaged as a result of the actions described in this Complaint.

288.     Under Tenn. Code Ann. §§ 66-3-302 *et seq.* and Del. Code tit. 6, §§ 1301 to 1312, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

289.     The State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont and seeks a constructive trust over such property or value for the benefit of the State.

290.     As described above, Corteva and New DuPont assumed Old DuPont's actual fraudulent transfer liability.

### COUNT VI
### CONSTRUCTIVE FRAUDULENT TRANSFER (CHEMOURS SPINOFF) – UFTA
### (OLD DUPONT, CHEMOURS, NEW DUPONT, AND CORTEVA)

291.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

292.     Under UFTA's constructive fraudulent transfer provision, a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if "the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or

64

transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due"; or (iii) "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Tenn. Code Ann. §§ 66-3-305(a)(2), 66-3-306(a).

293.    The State is and was a creditor of Chemours at all relevant times.

294.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

295.    Each of the Chemours Transfers and Chemours's assumption of the Assumed Liabilities was made to benefit, or for the benefit of, Old DuPont.

296.    At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

297.    Chemours made the Chemours Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

298.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Assumed Liabilities.

299.    At the time that the Chemours Transfers were made and Chemours assumed the Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

300.    The State has been harmed as a result of the Chemours Transfers.

301.     Under Tenn. Code Ann. §§ 66-3-301 *et seq.* and Del. Code tit. 6, §§ 1301 to 1312, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

302.     The State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont and seeks a constructive trust over such property or value for the benefit of the State.

303.     As described above, Corteva and New DuPont assumed Old DuPont's constructive fraudulent transfer liability.

### COUNT VII
### ACTUAL FRAUDULENT TRANSFER (DOWDUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA) – UFTA (OLD DUPONT, CORTEVA, AND NEW DUPONT)

304.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

305.     The State is and was a creditor of Old DuPont at all relevant times.

306.     Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through its participation in the DowDuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

307.     The Old DuPont Transfers were made for the benefit of New DuPont and/or Corteva.

308.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

309.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors, including the State.

310.    The State has been harmed as a result of the Old DuPont Transfers.

311.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the State that have been damaged as a result of the actions described in this Complaint.

312.    Under Tenn. Code Ann. §§ 66-3-301 *et seq.* and Del. Code tit. 6, §§ 1301 to 1312, the State is entitled to void the Old DuPont Transfers and to recover property and value transferred to New DuPont and Corteva.

313.    The State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont and seeks a constructive trust over such proceeds for the benefit of the State.

## COUNT VIII
## CONSTRUCTIVE FRAUDULENT TRANSFER (DOWDUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA) – UFTA
## (OLD DUPONT, NEW DUPONT, AND CORTEVA)

314.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

315.    The State is and was a creditor of Old DuPont at all relevant times.

316.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

317.     Each of the Old DuPont Transfers was made to benefit, or for the benefit of, New DuPont and/or Corteva.

318.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

319.     Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

320.     Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

321.     At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

322.     The State has been harmed as a result of the Old DuPont Transfers.

323.     Under Tenn. Code Ann. § 66-3-301 *et seq.* and Del. Code tit. 6, §§ 1301 to 1312, the State is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

324.     The State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont and seeks a constructive trust over such proceeds for the benefit of the State.

## VII.   REQUEST FOR RELIEF

WHEREFORE, the State asks that this Court:

1.      Award a temporary writ of injunction, enjoining and restraining the further continuance of the public nuisance created by Defendants pursuant to Tenn. Code Ann. § 29-3-105 and Tenn. R. Civ. P. 65 and/or issue an abatement order pursuant to Tenn. Code Ann. § 29-3-110 and Tenn. R. Civ. P. 65 that shall perpetually enjoin the defendant from engaging in, conducting, continuing, or maintaining the nuisance, directly or indirectly, by Defendants or Defendants' agents or representatives.

2.      Find Defendants liable for all costs to investigate, test, clean up and remove, restore, treat, monitor, and for such orders as may be necessary to provide full relief to address the threat of contamination to the State, including the costs of:

    i.    Past and future testing of natural resources at and around the sites throughout the State where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed and, thus, likely caused PFAS contamination;

    ii.   Past and future treatment of all natural resources at and around the sites throughout the State where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFAS until restored to non-detectable levels;

    iii.  Past and future monitoring of the State's natural resources at and around the sites throughout the State where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

69

iv. Providing water from alternate sources;

v. Installing and maintaining wellhead treatment;

vi. Installing and maintaining wellhead protection program;

vii. Installing and maintaining an early warning system to detect PFAS before it reaches wells;

viii. Outreach, education, community engagement, and additional public health studies, assessments, and measures;

ix. Implementing biomonitoring programs for water, soil, air, and all other impacted environmental media in communities and other areas where surface water and/or groundwater sources have become contaminated by PFAS;

x. Collecting and safely disposing of existing AFFF from sites around the State;

xi. Designing, implementing, and operating biomonitoring programs and studies and costs to otherwise assess PFAS public health impacts for all residents of the State; and

xii. Otherwise responding to PFAS contamination resulting from Manufacturer Defendants' AFFF Products so the contaminated natural resources are restored to their original condition or are replaced by reasonably equivalent resources;

3. Order Defendants to pay all damages to compensate the residents of the State for the lost use and value, including loss of tax revenue of and other economic benefits, from these natural resources during all times of injury caused by PFAS;

4. Order past and future investigation, assessment, testing, treatment, and remediation of all AFFF-related contamination at sites where Defendants' AFFF Products were used and which

contain detectable levels of PFAS restored to nondetectable levels, including the State's oversight costs;

5.      Order future monitoring of the sites and the State's natural resources where Defendants' AFFF Products were used as long as there is a detectable presence of PFAS and restoration of such natural resources to their pre-contamination condition, including the State's employees' time and associated costs;

6.      Order Defendants to pay punitive damages, pursuant to Tenn. Code Ann. § 29-39-104(c);

7.      Order Defendants to pay for all other damages sustained by the State in its sovereign, *parens patriae*, public trustee, landowner, and other capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

8.      Order Defendants to reimburse the State for its costs of responding to PFAS contamination, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources, including the State's oversight costs, resulting from Defendants' AFFF Products so that such natural resources are remediated and restored to their original condition;

9.      Order Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination of the State's natural resources, including the State's oversight costs, resulting from Defendants' AFFF Products so that such natural resources are remediated and restored to their original condition;

10.     Order Defendants to reimburse the State for its costs of abatement of the public nuisance, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources at

71

and around the sites throughout the State where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed so that such natural resources are restored to their original condition;

11. Compel Defendants to pay special damages to the State for public nuisance, funding its performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the transport, storage, use, handling, release, spilling, and/or disposal of Defendants' AFFF Products and compelling Defendants to compensate the citizens of the State for the costs of restoration and replacement, including lost use and value of any injured natural resource;

12. Find and declare that the State has conferred a benefit onto Defendants in the form of costs incurred responding to PFAS contamination resulting from Defendants' AFFF Products, and that Defendants have been unjustly enriched by its practice of externalizing the costs associated with PFAS contamination onto the State;

13. Order Defendants to pay restitution to the State;

14. Order Defendants to disgorge all ill-gotten gains;

15. Void the Chemours Transfers and recover property and value transferred to Old DuPont;

16. Void the Old DuPont Transfers and recover property and value transferred to New DuPont;

17. Void the Old DuPont Transfers and recover property and value transferred to Corteva;

18.     Enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Chemours;

19.     Enjoin New DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

20.     Enjoin Corteva, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

21.     Impose a constructive trust over the proceeds of the Chemours Transfers to Old DuPont for the benefit of the State;

22.     Impose a constructive trust over the proceeds of the Old DuPont Transfers to New DuPont for the benefit of the State;

23.     Impose a constructive trust over the proceeds of the Old DuPont Transfers to Corteva for the benefit of the State;

24.     Award the State costs and fees in this action, including reasonable attorneys' fees incurred in prosecuting this action, and the State's investigation costs together with prejudgment interest, to the full extent permitted by law;

25.     Enjoin Defendants from further actions that will damage the State through the use of PFAS in any way;

26.     That this Complaint be filed without cost bond as provided by Tenn. Code Ann. §§ 20-13-101, 29-3-104;

27.     That process issue and be served upon Defendants, requiring them to appear and answer this Complaint;

28.     That execution may issue for any monetary amounts adjudged against Defendants; and

29.     Award the State such other relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED this 31st day of May 2023.


                              /s/ Jonathan Skrmetti
                              JONATHAN SKRMETTI (BPR No. 31551)
                              Attorney General and Reporter
                              State of Tennessee


                              /s/ Sohnia W. Hong
                              SOHNIA W. HONG (BPR No. 17415)
                              Deputy Attorney General
                              (615) 741-2379
                              sohnia.hong@ag.tn.gov


                              /s/ Amanda E. Callihan
                              AMANDA E. CALLIHAN (BPR No. 035960)
                              Assistant Attorney General
                              Office of the Tennessee Attorney General
                              Environmental Division
                              P.O. Box 20207
                              Nashville, Tennessee 37207
                              (615) 253-3739
                              amanda.callihan@ag.tn.gov